# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHARLES DANIELS, JR.**
      **Plaintiff,**

    v.                                            Case No. 12-C-0958

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration[1]**
      **Defendant.**

## DECISION AND ORDER

Plaintiff Charles Daniels applied for social security disability benefits, claiming that he was unable to work due to spinal stenosis, foot problems, and sleep apnea. The Social Security Administration ("SSA") denied his application initially (Tr. at 54) and on reconsideration (Tr. at 55), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 8). The Appeals Council then denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the agency on plaintiff's application. Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012). Proceeding pro se, plaintiff now seeks judicial review of that decision.

## I. APPLICABLE LEGAL STANDARDS

The SSA has adopted a sequential five-step test for determining disability, under which the ALJ asks: (1) whether the claimant is currently unemployed; (2) if so, whether he has a "severe" impairment;[2] (3) if so, whether the impairment is one that the SSA considers

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin, who became Acting Commissioner of Social Security on February 14, 2013, is substituted as the defendant in place of Michael J. Astrue.

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c).

conclusively disabling;³ (4) if not, whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work;⁴ and (5) if not, whether he is capable of performing any other work. Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012). The claimant bears the burden of proof in each of the first four steps. Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). If he reaches step five, however, the burden shifts to the government to present evidence establishing that the claimant can perform work that exists in a significant quantity in the national economy. Id. ALJs often rely on vocational experts, who provide an assessment of the types of occupations in which claimants can work and the availability of positions in such occupations, in determining whether this burden has been met. Id.

The reviewing federal court does not re-determine disability; rather, the court assesses the ALJ's decision deferentially, affirming if it is supported by "substantial evidence." Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Id. The court may not substitute its judgment for that of the ALJ; if reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review. Id. The ALJ must build an accurate and logical bridge between the evidence and the result, but in analyzing an ALJ's opinion for fatal gaps the court gives the opinion a commonsensical reading rather than nitpicking at it. See Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).

---

³These conclusively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). See 20 C.F.R. § 416.920(d).

⁴RFC is an assessment of the claimant's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. SSR 96-8p.

2

## II. FACTS AND BACKGROUND

**A. Plaintiff's Application and Supporting Materials**

In February 2009, plaintiff applied for supplemental security income ("SSI"), alleging a disability onset date of February 2, 2002.[5] (Tr. at 117.) In a disability report, he claimed inability to work due to spinal stenosis, sleep apnea, high blood pressure, pain in both arms, and chronic headaches. He wrote that he woke up in pain every day, could not do repetitive activities, could only stand for thirty-five minutes because of back pain, and had to change positions after sitting for more than twenty minutes. He also complained of headaches two to four times per week lasting for a couple hours. He indicated that he last worked in February 2001, at a desk job; he had to keep getting up to walk around every few minutes so they let him go. (Tr. at 133.)

In function reports, plaintiff indicated that on a typical day he would get up, help his son off to school, and then try to loosen his neck. (Tr. at 139, 157.) If the pain subsided, he would try to go for a walk, then come home, sit down and watch TV or listen to music. Some days he would go to the library or the store, but most days he stayed home. (Tr. at 139, 157) He could maintain personal care, prepare quick and simple meals, and do some cleaning when he felt up to it. (Tr. at 140, 141, 158, 159.) His family helped with laundry and other chores. (Tr. at 141, 159.) Hobbies included watching TV, reading, and playing board games with his kids. (Tr. at 143, 161.) He indicated that repetitive motions such as lifting, bending, and kneeling caused neck and back pain, as did sitting and standing too long. (Tr. at 144.) He used a CPAP machine for his sleep apnea and took Ibuprofen for pain. (Tr. at 145.)

---

[5]Plaintiff filed a previous application for benefits, which was denied in 2008. (Tr. at 128-29.)

**B.      Medical Evidence**

**1.      Treatment Records**

On May 12, 2009, plaintiff established care at the Procare Capitol Clinic with Dr. Mohammad Taher, who noted a medical history of sleep apnea, spinal stenosis, and hypertension. Dr. Taher assessed obstructive sleep apnea, hypertension, eczema, and allergic conjunctivitis. Plaintiff was not at the time taking any medication for his blood pressure, which measured 130/80 that day. Dr. Taher provided a prescription for Optivar for watery itchy eyes, and Hydrocortisone for mild eczema on plaintiff's elbows. Plaintiff indicated that he needed some equipment for his CPAP, and Dr. Taher told him to try to find out what kind. Dr. Taher ordered tests and scheduled a follow up in one week. (Tr. at 244, 267.)

Plaintiff returned on May 19, 2009, with a blood pressure reading of 142/100. Dr. Taher assessed obstructive sleep apnea, hypertension, eczema, allergic conjunctivitis, mild elevation in liver enzymes, dyslipidemia, and hypovitaminosis. He started plaintiff on Vitamin D, switched him from Optivar to Zaditor due to an insurance issue, and ordered further tests. (Tr. at 243, 276.)

During their May 26, 2009 visit, plaintiff's blood pressure measured 138/88. Dr. Taher assessed (1) obstructive sleep apnea, (2) hypertension, (3) eczema, (4) allergic conjunctivitis, (5) mild elevation in liver enzymes, (6) dyslipidemia, (7) hypovitaminosis, and (8) spinal stenosis. Dr. Taher reviewed plaintiff's test results, with his liver enzymes much better and his hepatitis panel negative. He saw no need for any further work-up. Plaintiff requested Dr. Taher complete a W2 form, "which was filled [out] to the best of our knowledge with discussion with the patient." (Tr. at 242, 262.) Plaintiff was to return in three months for followup. (Tr. at

4

242, 266.)

In the May 26, 2009 "medical assessment request" form, Dr. Taher recommended that plaintiff apply for SSI. (Tr. at 288.) He listed diagnoses of obstructive sleep apnea and spinal stenosis, with a fair prognosis. He indicated that plaintiff could occasionally lift twenty pounds, ten pounds frequently; stand/walk at least two hours in an eight hour day, no more than five minutes at a time; and sit at least two hours in an eight hour day. (Tr. at 289.) He further indicated that plaintiff could participate in activities/work for one to two hours per day. (Tr. at 290.)

On July 17, 2009, Dr. Taher completed a "lumbosacral spine impairment medical assessment form," again listing diagnoses of spinal stenosis and obstructive sleep apnea, with a fair prognosis. He characterized the severity of plaintiff's pain as "moderate." (Tr. at 286.)

On July 21, 2009, plaintiff returned to Dr. Taher, who listed the same eight conditions as previously. Plaintiff's blood pressure was significantly elevated at 152/100. Dr. Taher explained the effects and side effects of high blood pressure and asked plaintiff to bring in all his medication bottles to the next office visit. (Tr. at 241, 265.)

During their August 21, 2009 office visit, Dr. Taher again assessed the same conditions. He noted that plaintiff was "here mainly for follow up. He has been having spinal stenosis for a long period of time and he said that he had an MRI of the lumbar spine in 2005." (Tr. at 240, 264.) Plaintiff also had a medical assessment form he wanted filled out, which Dr. Taher "filled out to the best of our knowledge with discussion of the patient." (Tr. at 240, 264.) Plaintiff was to return in one week for recheck of blood pressure, which was 160/120 on this visit. (Tr. at 240, 264.)

In the August 21, 2009 "chronic pain syndrome medical assessment form," Dr. Taher

5

listed diagnoses of spinal stenosis, obstructive sleep apnea, and hypertension, with a fair prognosis. He identified symptoms of chronic pain, non-restorative sleep, morning stiffness, multiple chemical sensitivities, and depression. This time, he rated plaintiff's pain as "severe." (Tr. at 278, 280.) As clinical findings, he listed spinal stenosis on L-spine MRI. He also checked medication side effects of drowsiness/sedation.[6] (Tr. at 279.) He noted limitations in reaching, handling, and fingering due to pain/paresthesia, with plaintiff able to use his hands and fingers 70-80% of the day, and his arms for reaching 40-60% of the day. Plaintiff also needed to avoid exposure to chemicals, solvents, and smoke, and he would be absent about four days per month due to his impairments. Dr. Taher further indicated that plaintiff had "decreased ability for repetitive movement." (Tr. at 281.)

On August 25, 2009, plaintiff returned to the Capitol Clinic, with Dr. Taher listing the same conditions. He wrote: "Spinal stenosis that was confirmed on MRI [in] 2005 according to the patient." (Tr. at 239, 263.) Dr. Taher again filled out paperwork for plaintiff's disability claim. Plaintiff's blood pressure was better during this visit, and Dr. Taher decided to monitor it for now; he was to return in one month for follow up. (Tr. at 239, 263.)

In the August 25, 2009 "physical residual functional capacity questionnaire" he completed, Dr. Taher listed diagnoses of spinal stenosis, obstructive sleep apnea, and hypertension, with a fair prognosis. He listed symptoms of neck pain, back pain, and bilateral shoulder and arm pain for which plaintiff used Motrin or Ibuprofen. (Tr. at 283.) He opined that plaintiff could occasionally twist or climb stairs, rarely stoop or crouch, and never climb ladders.

---

[6]Dr. Taher did not specify which medications caused these side effects. His August 21, 2009 treatment note listed medications of Hydrocortisone cream, Zaditor eye-drops, and Vitamin D. (Tr. at 264.) Plaintiff was not at the time taking prescription medications for his blood pressure or (so far as the record shows) for pain.

6

Plaintiff could use his hands and fingers 60-80% of the day and arms (reaching overhead) 40-60% of the day. His impairments would likely produce good and bad days and about four absences per month. (Tr. at 284.)

On October 22, 2009, plaintiff saw Dr. Jonathan Marquez at the Capitol Clinic, with a primary complaint of sinus congestion, high blood pressure, and sleep apnea. On exam, his neck was supple, with no vein distention or lymphadenopathy. (Tr. at 261.) He had full range of motion of both upper and lower extremities, with no joint swelling. For hypertension, Dr. Marquez provided samples of Benicar/HCT; for sleep apnea, Dr. Marquez told him to have the CPAP machine repaired; and for chronic sinusitis, Dr. Marquez referred plaintiff to an ENT specialist. (Tr. at 262.)

On October 29, 2009, plaintiff saw Dr. Taher, who listed the same conditions as in previous notes. Dr. Taher provided a prescription for the missing pieces on plaintiff's CPAP machine. His blood pressure was much better, 130/80, and Dr. Taher continued Benicar/HCT. Plaintiff was to come back in three months or as needed. (Tr. at 260.)

On December 29, 2009, plaintiff returned to Dr. Taher, who again noted the same eight conditions. Plaintiff's blood pressure remained under good control, and Dr. Taher continued medications. (Tr. at 258.) Plaintiff did complain of neck and right knee pain, indicating that he was in a motor vehicle accident the previous Saturday. Examination of the neck showed normal range of motion with some pain on turning the neck to the left; examination of the right knee showed mild focal tenderness at the lateral aspect. His gait was normal and neuro exam unremarkable. Dr. Taher obtained x-rays of the neck and right knee to rule out hairline fracture. (Tr. at 259.) Plaintiff was to return in one week for follow up (Tr. at 259), but the next treatment note in the record is dated February 25, 2010. At that time, Dr. Taher listed, in

7

addition to the previous list of eight conditions, neck pain and right knee pain.  However, the note did not discuss any treatment for neck or knee pain; plaintiff mainly wanted a refill of his Zaditor eye-drops.  (Tr. at 256.)  His blood pressure was mildly elevated, but he had not taken his medication that morning.  (Tr. at 257.)

Plaintiff next saw Dr. Taher on April 12, 2010, complaining about itching and discharge from his eye.  Zaditor had become ineffective, and Dr. Taher provided a prescription for Gentamycin eye-drops.  Dr. Taher listed the same nine conditions as at the previous visit, but the note again set forth no treatment for pain.  (Tr. at 255.)

At an August 27, 2010 office visit, Dr. Taher listed the same nine conditions, indicating that plaintiff was there mainly for followup and needed a refill of his blood pressure medication because he ran out.  He had not taken his medication over the last week, and his blood pressure was significantly elevated at 176/132.  Dr. Taher filled out a W2 form on plaintiff's request and advised him to start taking his blood pressure medications.  (Tr. at 292.)

On September 23, 2010, plaintiff came in "mainly for a followup on his hypertension, beside that he has obstructive sleep apnea for [which] he is on CPAP machine."  (Tr. at 293.)  Review of systems was unremarkable.  Dr. Taher listed the same nine conditions as before, plus a tenth: "Plantar and posterior calcaneal spurs on x-ray of the left foot on 09/07/10."  (Tr. at 293.)  For the plantar spurs, Dr. Taher referred plaintiff to Dr. McIver.  His blood pressure was again very high, as he ran out of medication; Dr. Taher increased the Benicar/HCT dose.  Dr. Taher also reviewed the result of a CPAP titration study and provided a prescription for accessories, including a nasal mask.  Plaintiff was to return in three months or as needed.  The note said nothing about treatment for neck or back pain.  (Tr. at 294.)

8

## 2. Consultants' Reports

In April 2008, plaintiff saw Dr. Agnes Lun for a consultative examination relative to his previous application for social security benefits. (Tr. at 221, 297.) Plaintiff estimated that he could walk twenty blocks, sit or stand for fifteen to twenty minutes before he had to change positions, and lift fifty pounds but not repetitively. (Tr. at 222.) Plaintiff ambulated unassisted and maneuvered on and off the exam table unassisted and with no pain behaviors. On exam, his neck was supple with full range of motion. Dr. Lun noted no tenderness with palpation of the C-spine. Strength was 4/5 on the right compared to 5/5 on the left with shoulder abduction; strength was 5/5 in other muscle groups. Dr. Lun assessed borderline diabetes, asymptomatic; a history of hypertension, controlled at the time; sleep apnea, with CPAP resolving previous symptoms of significant fatigue; and neck pain, with a history of cervical stenosis with radiculopathy to the shoulders. She noted that his ability to carry objects appeared to be intact, as well as handling objects, hearing, and speaking. (Tr. at 223.) An x-ray of the cervical spine taken at that time revealed minor degenerative changes. (Tr. at 220, 225.)

In April 2009, plaintiff underwent a consultative examination with Dr. Daniel Jankins relative to the instant application. Plaintiff complained of neck pain, helped by Ibuprofen. He indicated that he could walk up to twenty minutes or a mile. (Tr. at 226.) On exam, his neck moved well, with some palpable posterior neck and trapezius pain. He had full range of motion of both shoulders, elbows, wrists, and the joints of his hands, with 5/5 grip strength bilaterally. Dr. Jankins concluded that plaintiff "supposedly" had spinal stenosis; sleep apnea; high blood pressure, somewhat uncontrolled; and headaches. (Tr. at 227.) A x-ray taken on April 14, 2009, revealed some minimal degenerative lipping in the interior vertebral plate of the body of C4 and C5. (Tr. at 225.)

9

On July 10, 2009, Dr. Mina Khorshidi prepared a physical RFC assessment report for the SSA (through the state agency), finding plaintiff capable of light work. (Tr. at 229-36.) Dr. Khorshidi noted a lack of any treatment history for plaintiff's medical conditions and the unremarkable exam findings from Drs. Lun and Jankins. (Tr. at 236.) On November 5, 2009, Dr. Pat Chan reviewed and affirmed Dr. Khorshidi's RFC assessment. (Tr. at 253.)

**C.  Hearing Testimony**

On December 22, 2010, plaintiff appeared with a lay advocate before ALJ Robert Bartelt, Jr. The ALJ also summoned a vocational expert ("VE"), Robert Raketti. (Tr. at 24.) At the outset of the hearing, plaintiff's representative noted that the onset date alleged in the application – February 2, 2002 – could not be sustained. Instead, he asked the ALJ to consider the date of the application – February 5, 2009 – as an amended onset date.[7] (Tr. at 25.)

Plaintiff testified that he was forty-two years old, a high school graduate with a couple years of technical school education in auto servicing. (Tr. at 26.) He stood 5'11" tall and weighed 252 pounds. (Tr. at 37.) He reported past employment as an auto mechanic, warehouse worker for a pizza company, pallet maker for a soda company, and account executive for a newspaper. (Tr. at 26, 39-41.) The account executive job involved calling and soliciting advertisements. (Tr. at 38.) He left that job in 2001 or 2002 because his spinal condition prohibited him from sitting for long periods of time. (Tr. at 26, 39.) He testified that

---

[7]See SSR 83-20 ("Onset will be established as of the date of filing provided the individual was disabled on that date. Therefore, specific medical evidence of the exact onset date need not generally be obtained prior to the application date since there is no retroactivity of payment because title XVI payments are made beginning with the date of application provided that all conditions of eligibility are met.").

10

he had looked for work since then but had not found anything he could physically do; the jobs required sitting for a long time, bending, or some strenuous activity that his body would not allow. (Tr. at 26.)

Plaintiff testified that he was prevented from working by spinal stenosis, which caused severe neck pain and headaches (Tr. at 27), for which he took Ibuprofen (Tr. at 43). He also noted that he had been diagnosed with sleep apnea in 2005. (Tr. at 27.) He further testified that he suffered from high blood pressure and, more recently, a bone spur in his left foot, which caused him to start using a cane for stability. (Tr. at 28-29, 45.) He saw a foot specialist, Dr. McIver, who advised him to get arch supports, which helped initially but no longer. (Tr. at 29, 44.) For sleep apnea, he used a CPAP machine, which helped when he used it. (Tr. at 29-30.) His blood pressure was under control with medication. (Tr. at 30.)

Plaintiff testified that he did not have a regular sleep schedule, usually sleeping in two to three hour increments throughout the whole day. He testified that he could cook small meals and do a couple dishes. (Tr. at 31.) Family members helped him with the laundry. He lived on the first floor of a duplex, which he was able to keep clean. He could also care for his personal hygiene. (Tr. at 32.) He could sit comfortably for about twenty to twenty-five minutes before he had to get up and stretch or walk around. (Tr. at 32.) Before the bone spur, he could walk about eight blocks comfortably before he had to sit down and rest for at least five minutes; with the bone spur, he had pain after a block. He could comfortably lift no more than ten or fifteen pounds. (Tr. at 33.) He testified that after five or ten minutes of repetitive arm motions pressure and pain built in his shoulders and back. (Tr. at 34.) For social activities, he watched TV and read. (Tr. at 35.) He lived with his thirteen year old son, who helped him a lot, as did his uncle and mother, who lived upstairs. (Tr. at 35-36.) His current source of income was W-2

11

benefits. (Tr. at 37.)

The VE classified plaintiff's past work as follows: telemarketer (soliciting sales for the newspaper), sedentary, semi-skilled; warehouse worker (for the pizza and soda companies), medium, unskilled; and auto mechanic, medium, skilled. The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to lifting ten to fifteen pounds maximum on an occasional basis, sitting twenty to twenty-five minutes at a time, standing fifteen to twenty minutes at a time, with no prolonged or repetitive motion of the neck. (Tr. at 47.) The VE responded that the lifting restriction precluded the full range of light work, and the neck restriction eliminated most manufacturing jobs. However, several sedentary level jobs could be done, including order filler, telephone information clerk, and surveillance monitor. These positions would allow some change of position from sitting to standing while working, in addition to the usual breaks. (Tr. at 48.) A person restricted as Dr. Taher indicated would not be able to maintain competitive employment based on absences (four days per month).[8] (Tr. at 48-52.)

**D.    ALJ's Decision**

On April 7, 2011, the ALJ issued an unfavorable decision. Following the five-step sequential process, the ALJ determined that plaintiff had not worked since the protective filing date of his application, and that he suffered from the severe impairments of degenerative disc/spinal changes, sleep apnea, obesity, and bone spurs, none of which qualified as conclusively disabling under the Listings. (Tr. at 14.)

In determining RFC, the ALJ rejected the severe limitations assessed by Dr. Taher,

---

[8]The VE did not find problematic the postural and manipulative limitations in Dr. Taher's reports. (Tr. at 50-51.)

12

noting that the presence of spinal stenosis had not been objectively established, with x-rays taken in 2008 and 2009 showing only mild or minimal degenerative cervical changes, and Dr. Taher's diagnosis coming from a statement plaintiff made about a purported MRI from 2005; thoracic and lumbar deformities/changes had also not been objectively determined; and consultative examiners Drs. Lun and Jankins observed full range of motion of plaintiff's neck and back, with Dr. Taher reporting similar findings in December 2009. The ALJ also found Dr. Taher's restrictions inconsistent with plaintiff's reported daily activities. The ALJ determined that the record as a whole better supported the assessments from the state agency physicians that plaintiff retained the capacity to perform light work. (Tr. at 15.) The ALJ further stated that, in view of the objective findings and limited conservative treatment, along with his activity level, plaintiff had not demonstrated that he suffered from pain or other symptoms that could be considered disabling in severity. Rather, the ALJ determined that plaintiff retained the RFC for a wide range of light work that would not involve activities requiring an excessively prolonged period of time spent in one position. (Tr. at 16.)

Given this RFC, the ALJ determined at step four that plaintiff could not return to past work due to the exertional requirements beyond the light range. However, the ALJ found at step five that plaintiff would still be able to perform the requirements of other appropriate jobs that exist in significant numbers in the national economy. The ALJ further noted that even with a more restrictive RFC – one that essentially matched plaintiff's claims at the hearing – the claim still failed at step five. Specifically, according to the VE, a person limited to sedentary work that would not require sitting for more than twenty-five minutes at a time, standing for more than twenty minutes, lifting of more than fifteen pounds, or any repetitive neck motion, could work as a telephone order clerk, surveillance monitor, and order filler. (Tr. at 16.) Thus,

13

the ALJ found that plaintiff was not disabled and denied his application for SSI. (Tr. at 17.)

## III. DISCUSSION

Plaintiff argues that the ALJ's decision was not based on facts and is therefore erroneous. However, he alleges just one specific factual error. See Anderson v. Hardman, 241 F.3d 544, 545 (7th Cir. 2001) (holding that even pro se litigants must present arguments that consist of more than a generalized assertion of error).

The ALJ stated that the "presence of spinal stenosis has not actually been objectively established." (Tr. at 15.) Plaintiff contends that the diagnosis of spinal stenosis was based on tests administered by two certified medical hospitals within the last ten years, and that he does have documented objective proof that he has been diagnosed with spinal stenosis. (Pl.'s Br. [R. 11] at 2.) However, no such proof appears in the record, and the correctness of an ALJ's decision depends on the evidence that was actually before him. Eads v. Sec'y of Dept. of Health and Human Servs., 983 F.2d 815, 817 (7th Cir. 1993). Plaintiff has not presented this evidence to the court nor does he request a sentence six remand for its consideration.[9] Plaintiff notes that he signed releases to make his medical records available to the SSA, but the agency ordinarily collects medical evidence for the twelve months preceding the month in which the claimant applied,[10] 20 C.F.R. § 416.912(d), and plaintiff does not argue that the ALJ failed to

---

[9] To merit a sentence six remand, the claimant must show that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the administrative record. Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003).

[10] Plaintiff told Dr. Taher that the MRI documenting spinal stenosis was performed in 2005 (e.g., Tr. at 255), four years before he filed the instant application for benefits. In his brief, plaintiff indicates that he was diagnosed with this condition seven to eight years before he filed his initial disability claim in 2006. (Pl.'s Br. at 2.) He also admits that he continued to work for several years following the diagnosis. (Id.)

14

fully and fairly develop the record, which includes two consultative examinations and x-ray reports (Tr. at 220-27), in addition to the treatment notes from Procare.[11]

Plaintiff argues that because of his progressively worsening condition he is unable to maintain gainful employment. (Pl.'s Br. at 2-3.) However, the court's task is to review the ALJ's decision, not to re-determine disability. For the sake of completeness, I note that the ALJ supported his decision with substantial evidence, including the state agency consultants' reports and findings. (Tr. at 15, 220-36.) The ALJ rejected plaintiff's claim of disabling pain in light of the limited objective findings, limited conservative treatment, and plaintiff's activity level. (Tr. at 16.) In any event, as the ALJ noted, the result would be the same even accepting plaintiff's testimony regarding his functional limitations, as the VE testified that a person so limited could still work. (Tr. at 16.) Finally, the ALJ supplied a sound basis for rejecting Dr. Taher's opinions, noting that Dr. Taher had only been treating plaintiff for a few months at the time he created the reports at issue. (Tr. at 14.) The ALJ also noted that Dr. Taher included the diagnosis of spinal stenosis based on plaintiff's statement about a 2005 MRI rather than actual evidence (Tr. at 15, 239, 240, 263, 264); the tests in the case record revealed only minor or minimal degenerative changes in the cervical spine (Tr. at 15, 220, 225). The ALJ further noted that Dr. Taher's restrictions were inconsistent with the relatively normal exam findings set forth in the consultative examiners' reports and in Dr. Taher's own treatment notes. (Tr. at 15, 223, 227, 259.) The ALJ may reasonably reject a treating source report that is not well supported by the objective medical evidence, see, e.g., Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010); Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001); conflicts with the

---

[11]It appears that plaintiff had not seen a doctor for several years prior to commencing treatment with Dr. Taher at Procare. (Tr. at 136, 138.)

15

source's own treatment notes, see, e.g., Richison v. Astrue, 462 Fed. Appx. 622, 625 (7th Cir. 2012); Schmidt v. Astrue, 496 F.3d 833, 842-43 (7th Cir. 2007); or appears to be based primarily on the claimant's statements, see, e.g., Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008); see also 20 C.F.R. § 416.927(c) (indicating that the ALJ should in evaluating a medical opinion consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the support provided by the source for his opinion, and the consistency of the opinion with the record as a whole).

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 8th day of March, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge